Case No. 18-1085 et al., California Communities Against Toxics et al. Petitioners v. Environmental Protection Agency et al. Mr. Noran, for the Environmental Petitioners, Ms. Lesser, for Petitioner State of California, Mr. Grant, for Respondent, and Ms. Rooney, for Intervenors, Air Command, Quorum, et al. Mr. Noran, Now, we do not mean to imply anything. Ms. Foster from Los Angeles, she's comfortable with a bit of smog. We think that it is appropriate to reach the merits here. I understand that the Court could reach either one. The reason that's so is that the concern this Court has raised in cases like this one where there are both merits questions and procedural questions is one of prejudging the outcome of the administrative process. But in this case, the agency has told us what it intends to do in the notice-and-comment process. It has told us that it views itself as legally incapable of reaching any other outcome, and it's already begun to allow sources to take advantage of that particular result. Under those circumstances, in our view, it is appropriate to reach the merits of that particular outcome, and that's why we're starting with the merits here. Having said that, we're both prepared to answer questions on either prong, so if there are questions there, I'm happy to deal with them now, or you can wait for the State of California. So starting with what the WERA memo does. The question the WERA memo addresses is what role the major source threshold in Section 112A1 plays in Section 112's sequential step-by-step process. Section 112A1 defines a major source as one whose emissions exceed a particular threshold. At least at the starting point, 25 tons of combined pollutants or 10 tons of any one pollutant. Until the WERA memo, under that type memo, the rule that the WERA memo replaced, EPA treated that threshold as a trigger for mandatory compliance with Section 112 technology and risk-based standards. So once a source complied with a maximum achievable standard, it had to do so permanently, even if that standard required it to reduce its emissions below the major source threshold. In that case, the source had to comply with the lower of those two, that is, the maximum achievable control technology standard. What the WERA memo does is instead of treating the threshold in that fashion as a trigger for mandatory standards, it understands that threshold as being an exemption from the standards themselves. So if a source has been complying with a maximum achievable standard that brought emissions from 100 tons per year down to 5 tons per year, that source now had the option of raising its emissions all the way to the major source threshold, 24.99 tons, at least potentially. Now, the sole rationale of the WERA memo is that that result is unambiguously compelled by the major source definition in Section 112A1 of the generic. Because the agency relies solely on that plain text rationale, that it has no choice at all in the matter, this is the unusual case in which the agency has to prevail at Chevron Step 1. If the statute is ambiguous, if the agency in fact does have a choice here, then the memo is incorrect and it should be vacated. Or remanded. That's right. Although in this case, there are very serious deficiencies. The agency has a lot of work to do depending on where it is. I'm inclined, for as it were, to agree with you that the statute is not perfectly clear and that there's room for Chevron Step 2. So that should be enough to declare the memo invalid? No, but not necessarily. It goes to the question of one will have finality. In other words, this way it'll wait for your colleague to come up. Because if one concluded that it represented only the policy position of the agency, or interpretable, and would have to be defended in a subsequent adjudicatory proceeding. At that subsequent adjudicatory proceeding, it could go to Chevron Step 2. But in this case, Your Honor, the memo on its face says that it is final and effective. It doesn't say that it is a proposal for some future rulemaking or adjudication. There are sources that are already taking advantage of the exemption that the memo opens up. And again, the agency has said that whatever this notice of comment proceeding is, it can only ever reach one result, the same result here. And in Arizona v. Thompson, the court said, well, that's enough. The fact that the agency might revisit it in a notice of comment proceeding doesn't really matter. This decision is final. Your question is whether review properly needs to wait for EPA to apply this to particular sources. You know, I think I find the more difficult part of your case, your colleagues' responsibility. Let me just say that both Appalachian Power and in particular Note 18 essentially hold that review belongs here in this court. Aren't you struck by the fact that our cases are all over the lot? On the procedural question? On whether a guidance document is reviewable or not. Appalachian Power represents one extreme, and then we have other cases, even more recent cases, that represent another extreme. One recently written by now Justice Kavanaugh. It does seem a little bit inconsistent, but if I may say so, there are a few consistent points that run through almost the entirety of this first jurisprudence. Please save our honor. Yes. And the key one is that if the agency makes a change to the preceding regulatory landscape, either as defined by previous rules or as defined by the statute, that is a legislative rule. That's a clever phrase. Previous regulatory landscape. My understanding of your brief is the recognition that the prior CITES memo was clearly illegal. In the sense that it, too, is a legislative rule that should have been issued. That is our position. But if the CITES memo is illegal, what is the status quo, even if you were to vacate the where memo? The CITES memo would remain in place. Why would the CITES memo remain in place if it's illegal? That is the function of the statute of purpose. If someone were to challenge the CITES memo, I think we may not be in the same situation. But at this point... What do you mean the statute of purpose? Well, I mean, first, there's a six-year statute of limitations on any challenge to the APA. And under the Clean Air Act, there's a 60-day limitation. Both of those... Yes, but then the 60-day would have been the assumption that the agency had issued a regulation. Well, it had published it in the federal legislature. Yes. To my understanding, it didn't. But I think what those reflect, both of those, is a preference at a certain point for certainty. That is what statutes of purpose do. At a certain point, an agency action that someone could have challenged ends up being effectively the law. And I think that's the situation we're in here with the CITES memo. That's fine. That's fine persuasion. Well, I'm not sure what's our best case on that. Okay. Well, perhaps I'm too exhausted, almost all of my time. Is there any particular questions on the statute? Well, we may have some questions on the... I can't speak for anyone else, but on the next go-round. Okay. In that case, it appears the procedural questions have been resolved. Thank you. Good morning, Your Honors. May it please the Court, Kavita Lester, Argo, on behalf of the State of California. I will be addressing the harder questions, I believe, with Petitioner's notice and comment claim. The Warren Memo is a legislative rule requiring notice and comment for the following reasons. It has force and effect of law. It revoked a prior legislative rule. And it substantially affects the public to such a degree that the policy interests and the line... Sorry, ma'am, would you just do the latter? I'm sorry. And it substantially affects the public to such a degree that the policy interests implicating the Administrative Procedure Act and the... Suppose the agency said, our view of the statute is different than the site's memo. And we will express that view, which is the view expressed in the W Memo, not Ware Memo, in proceedings for permit applications. Would you have a view, then, that there was anything wrong? Well, the problem was an as-applied challenge. So that would be the Ware Memo being applied, for example, by state fishing control agencies in a permit. I'm having difficulty. Oh, I'm sorry. I will speak up louder. Why don't you raise the... Raise the podium. The button on the right. I'm shorter than everyone else that's spoken, I guess. The problem, Your Honor, with the as-applied challenge, so challenges in an individual permitting decision, is that it would result in a patchwork of statewide decisions, which is exactly counter to... No, not exactly. Forgive me. Not exactly. Well, what happened is State A would take... State A is, first of all, unlike Bennett and Spears, the State... Bennett and Spears, you were talking about application to various federal agencies, and the Unitary Executive meant that it was what the wildlife did would apply to the rest of the federal government. But here we don't have that situation. States are free to take a different position than EPA. What would happen if they did? That possibly someone, the company, for instance, would appeal to EPA. EPA would take a different position, and that would be reviewable in court. Right? Well... But in that circumstances, EPA would be faced with a question, which I think is an interesting question, whether they can interpret the statute in Step 1 or Step 2 of Chevron. My instinct is it's Step 2. Let me answer that question with a couple of cases, Your Honor. For example, in Whitman, the Tribune Court specifically said that Section 307 of the Clean Air Act declares Congress's preference for immediate judicial review. So there would be no need for this as-applied sort of challenge. Actually, you put that in your footnote. I noticed that. So there is no need for a pre-enforcement... It's sort of inconsistent with the rest of the Supreme Court cases. But is there still... But that court did recognize, Your Honor, that there is no need for pre-enforcement review. But also, may I also... I agree. I agree. The Supreme Court is not all as consistent. We're really inconsistent. Then may I also make one further point, which is that... There are two separate questions. The one is finality. Sure. Do we have a final position? And we do, because we have a confirmation of the decision of EPA's legal position with respect to whether... I agree they have expressed a legal position. But the problem, the real important aspect of finality, does it bind anybody? And it binds no one. Well, I would disagree, Your Honor, that it is binding. Binding who? Because EPA admitted in its brief that, for example, let's say the state of California chose to ignore it. Right. Chose to apply the CITES memo as opposed to the WERA memo. Right. Go ahead. EPA is in, I believe, in page 29, footnote 9, and also page 30. I apologize if the petitions aren't exactly correct, but EPA did say that it would issue a revised permit in line with the WERA memo if the state disagreed. Well, what happened was... No, I think I read the brief rather carefully. What happens is, if California took that position, the company that was the party whose modification was rejected would then have an opportunity to appeal to EPA. EPA could then take a position contrary to California, and then California, or certainly the environmental group, could appeal that case to the courts. And then the legal position that EPA has taken in the WERA memo would be before the court, just as it is before the court now. Yeah, but that assumes a conclusion. I think the problem is it's not final yet. And... In other words, the hypothetical in Judge Silberman's question, isn't that the position that the agency has taken? And it's certainly taken that in its brief. It has, but I don't believe subsequent permitting decisions would affect the matter that's before this court, because the matter that's before this court is whether the WERA memo should have complied with notice and comment proceeded with EPA, and whether it's inconsistent with the Clean Air Act, which Mr. Ryan was prepared to argue. But those subsequent permitting decisions would be applying the WERA memo in the same manner that we are challenging it here, which is that it is inconsistent. Perhaps they would consider the prospect that it isn't a crystal clear statute, and that it really is a shovel-on-step-two question, which would require a broader consideration. Or permitting... Let me give you this hypothetical. Suppose the government had simply said, look, we think the CITES memo is wrong and illegal, because it really was a legislative rule disguised as a guidance document, because it did really try to impose standards beyond the statute. We are going to take the position, as a litigating position, in subsequent permit proceedings contrary to the CITES memo. We're going to take the position that the statute means what we think it means. That would be... What would your view of it be then? So this would be the opposite of what's occurring. I'm sorry. So state permitting... No, what I'm phrasing is a classic policy statement. We are going to take this position in the adjudication. Policy statements are not reviewable. Policy statement... Well, there's the... Is it the Whitman case or the policy... Well, we are... So if the agency had simply said, that's the position we're going to take in litigation, would you assert that you had a direct right to review that? Well, I guess that goes back to why we have been arguing for where a memo is. Not a policy or a guidance document. No, but let's assume it was phrased the way I phrased it. We don't think the CITES memo is correct. We don't think it's legal either, because it was an effort to do a legislative rule as a guidance statement. But we are going to take the position in permits that along the lines of the W memo. The W memo, yes. The W memo. Now, it wouldn't be until maybe you got an adjudication where you got a determination whether that was shoved on step one or step two. But anyway, you see, if that was clearly phrased the way I phrased it, you would have to concede that was a policy statement. It would still be affecting... And that's why I think this is where the difference lies. It would still be substantially affecting the permitting rights of the regulated entities. No, it wouldn't be. It would be just... If an agency simply takes a position, like a U.S. attorney takes a position, this is the way I intend to enforce the statute. It's not reviewable. If an agency takes a position, this is the way we intend to enforce the statute. That's not reviewable. That's a policy statement. Understood. Policy statements have been historically characterized... And policy statements and interpretive rules are really treated the same way. As a way that an agency will enforce or not enforce. But here, this is different in that it's not merely stating what EPA is going to enforce or not enforce. It's actually revising Section 112 such that major sources are no longer required to comply with the mandatory obligations of Section 112B. The only difference would be if this document had the capacity to force people to comply. Most importantly, the states. And the answer is it does not. The states are not forced to comply with that. The states can say, we think that's baloney. We think CITES is the correct interpretation. And then the case comes back up to the EPA, and the EPA says, we disagree. And then the case goes to the court. Well, there are, and as you know, there are certain states that are actually don't, can't say it's baloney. I mean, there are certain states that are not, that are bound by EPA's determination. That happens all the time. People sometimes agree with agencies. Understood. But there are also statutoids. For example, I believe in Kentucky, a statutory prohibited from applying any sort of more emission, more stringent emission standards. That said, it doesn't change the fact that it would be applied at a state permanent decision. I do believe it still goes back to the precedent on pre-enforcement review and Congress's intent that Section 307 allows this court to determine questions of national applicability, which is why we're here. Well, that would be the first case. The first case would come to our court. That's a very interesting point. I wrote about that separately. But you're right. That first case would come to our court. Let's say California objected. And there was a company in California was sought to modify its permit to bring it from major to area. And California refused. And they then went to the EPA, which they had the right to do. EPA has certain 60 days. And they conclude to the contrary. And then California appeals. I understand. May I also raise, though, two points. One, that in this sort of timeline that you've outlined, there are sources throughout the nation that can reclassify today. There are two sources that are reclassified. And EPA's brief, I believe, has shown awareness that there are more than two sources. EPA's brief at 29 suggests that EPA is aware of more. So during this sort of timeline of challenges or even trying to find notice of a decision and a notice of a reclassification and that it slowly makes its way up to this court, there may be several more sources that have reclassified during that interim. And perhaps some of those challenges were not necessarily filed. They were filed in perhaps the local state court or perhaps the state federal court. It's directly counter to sort of the preference under 307. I'll probably just go back to that. But it's directly counter to the preference of 307 that this court decide matters of national applicability so that there's a uniform law. Well, that goes to the question of venue. Why don't you piggyback or why aren't you piggybacking some on the merits argument in terms of determining finality? In other words, the statute had a purpose. And the way the sites memo was written, it understood one purpose. Now the where memo doesn't, as it were, contest that purpose at all. But it simply says we disagree with the once in, always in approach. And we want this flexibility. And furthermore, it goes further and says it has already determined that the where memo says EPA had no authority to do what it did in terms of setting a trigger or time. So it's not only saying that the definition is clear, but it's saying that EPA has no other statutory authority under the Clean Air Act to address this issue. So given that, that's sending a clear signal to sources. Get going. And we'll see where we are. And we have these cases in the context of health and the environment saying that's one of the reasons that we consider whether or not it should be vacater or remand, citing a very famous opinion. And why doesn't that all factor in? Because I think Judge Silverman makes an excellent point. When you look at our cases and we talk about factors and then we try to line it up. And sometimes we said guidance is final agency action that requires notice and comment. And then other times we've gone. Right. And I think Your Honor has honed in on to the pure legal claim that is presented here, which is whether it's violated the Administrative Procedure Act and whether the where memo is consistent with the statutory purpose of the Clean Air Act. Judge Rogers has honed in on the question that this case presents a purely legal claim. And under cement count, that means that this matter is presumptively reviewable. In that the matter presents the question of whether the where memo has violated the notice and comment rulemaking procedures of the Administrative Procedure Act and also whether it is consistent with the statutory purposes of the Clean Air Act. The theory under which the where memo violated the APA because it is a legislative rule is based on the notion that the cites memo is a legislative rule. Correct, Your Honor. You know, almost sounds there's a doctrine in this court called the chutzpah doctrine. And it almost sounds like the chutzpah doctrine for you to be arguing that this illegal memo that we put out was really a notice and comment rulemaking. And just because we put it out as a guidance document doesn't mean you should treat it. They didn't put it out. They didn't put it out. Really? But just because the government put it out, it became automatically a regulation. Now, this would be the first case in all of history in which a guidance document is referred to six years later as a de facto regulation. When the government itself did not treat it as a regulation.  Well, is that a matter of dispute? The briefs are a little inconsistent on that in this sense that the intervener's brief takes the position that EPA has never enforced the cites memo consistently. Right. EPA doesn't join in that language and California comes back and says, no, no, no, no, that's not it at all. I wasn't too clear what would happen there and whether or not in the bowels of this Title V, you know, there are provisions for waiver and holding and abeyance, all those sorts of things. But nobody's briefed that. But the point is that, as I understand the case of the EPA's brief, they're not making an argument about inconsistent or failure to enforce cites.  Their objection to cites, what we call it on a policy ground or other ground, is that the once in, once always in is contrary to the plain text of Section 112A, whatever it is. Well, with respect to Erin's first question, whether in fact the cites memo was applied consistently and whether it was binding the intervener's site to two things. One is the transition policies, but those transition policies are not applicable here. Those transition policies spoke to how a facility can obtain a potential limit on its emissions. But the cites memo addresses something completely different, not how, but when. And so those transition policies that the intervener's site are not relevant. And then the second thing that the intervener's site to are there's two purportedly inconsistent applications. Over the last 23 years, interveners point to two, and one of which is when a source entirely stops using the solvents that triggered the standard. And the second instance was when the pollutant emitted by the source was delisted by EPA. So both of those, well, both of those examples, we would argue, are a bit of a stretch, particularly when industry interveners have for the last 23 years been complaining of the cites memo as binding and actually. Let me put this question to you. Yes. I suppose there were no where memo. And as I see it, there's nothing that stops EPA from taking the position that in adjudications that it does not agree with the cites memo. Is there? Well, the cites memo does speak in rather conclusive. I know. I know. But in an adjudication. Is there any reason why in an adjudication that EPA couldn't say we disagree with that? We think that's a different interpretation. And, Your Honor, when you, what do you mean adjudication in a sort of self-determination? Well, as I explained earlier, when you have, let us say, California objecting to a modification of source regulations, moving somebody from area to, from major to area, and California refuses, that source appeals to EPA. EPA, 60 days later, reverses. California then, or environmental groups, then take that under the court, to the Court of Appeals. Perhaps to the D.C. Circuit. I don't know. At that point, there's nothing to stop EPA from taking a different interpretation of that statute. Is there? Not how EPA has been applying the once and always in policy. I'm sorry? Not how EPA has been historically applying the once and always in policy. And it's consistently referred to. For example, It changes its view. It says, look, that interpretation in the site's memo is one we no longer agree with. It's just like, you know, it's like Chevron in a way. I believe it is instructive, though, Your Honor. Can you answer my question? Yes. There's nothing to stop them from doing that, is there? There's nothing. Well, there's nothing stopping it from doing that. It hasn't done that yet. Maybe there's nothing stopping it. Maybe there's nothing. But in the one instance that EPA has decided to take a different position than the site's memo, to explicitly reverse the site's memo within 2007 for a proposed rulemaking. So that seems to lend here... As you know well now, administrative agencies have options to proceed to make legal policy through adjudication or through rulemaking. Absolutely, Your Honor. But I believe this is different here. And this does seem to echo with the jurisprudence. While I've been trying to make sense of the smog, this does seem to echo with the jurisprudence of how this court has historically interpreted the exemptions to notice and comment rulemaking, which is that this court has construed those very narrowly. My question is, okay, why could not EPA simply take the position, the litigating position, even if there is no W memo, the litigating position, that we believe the site's memo is incorrect and we leave the statute different? In a hypothetical challenge somewhere down the line, could EPA take a different position than the site's memo? I'm just leery about getting into this hypothetical. That's fine. That's fine, Your Honor, but then you can ask your own hypothetical. I would prefer to have an answer to my question. Yeah, this is a tough hypothetical to answer because this is not presented by the facts, but EPA did take a rather conclusive position, a legal position in the site's memo, that this is how it's interpreting the Clean Air Act, that this interpretation is consistent with the Clean Air Act. So I think it would be difficult, of course, now taking a different position, but assuming there was no where memo and the site's memo had continued to be in effect for the last 23 years and 23 more years, I believe EPA would be in a tough position to take a different legal position than that espoused in the site's memo because the site's memo is consistent with the Clean Air Act. Oh, yeah, because you disagree with that. They take a different position, but you think they would be wrong because you think the site's memo is a correct interpretation. Yes, Your Honor. But that's not the question I'm asking. Is there anything to stop? Is there anything binding EPA to the site's memo? That's right. It certainly reads as if it's binding. It certainly reads as if it's a... It's a guidance statement. It certainly reads as if it's a confirmation of... It's a guidance statement, right? Doesn't it modify legal norms, though? Taking, Your Honor, back to your own opinion in the Supreme Court... Could you bring Mandamus? I'm sorry. Could you bring Mandamus? Arguing that you argued statute of repose, et cetera. This has been on the books for decades. The agency's been enforcing it, and now it says it's not going to enforce it. And the agency has, in the past, said, when we were thinking about changing it, we were going to do so through rulemaking. The agency has, and that is presented before us. The agency has said that we are thinking of doing rulemaking. We haven't yet seen a proposed rule, but that also doesn't change... And, again, I'm hearkening back to Matt Cohen and Whitman, but that doesn't change the legal position presented here. And I have taken way over my time, Your Honor, so I will... If there are any further questions... Thank you. Good morning, Your Honor. Eric Grant for Respondents. With me is Scott Jordan of EPA's Office of General Counsel, and I'll be sharing the time on my side with Shannon Bruton for the interveners. Speaking of the rulemaking, EPA's upcoming rulemaking went to the Office of Management and Budgets' interagency review process on February 25th of this year. And... When does the notice and comment go out? Your Honor, we think it's a reasonable expectation that that will be published in the Federal Register in June, essentially two months from now. Why does it take so long? That's another one of those eternal questions, Your Honor. And I would say, on the rulemaking, that there has been no prejudgment. My colleague on the other side made a statement that what we call the 2018 guidance said there could only be one result of this rulemaking, and I'd like to quote from the guidance page two, which is also joint appendix page two at the top. Are you talking about the 2018 guidance? Yes, Your Honor. All right. So, what are you quoting? I'm quoting from the top of page two, which is joint appendix two. Yeah. And that says that EPA will take comment on adding regulatory text that will reflect this plain language reading of the statute. It does not prejudge the outcome of that rulemaking. Well, the wording is framed in a way that suggests it's going to stick with its position since it has announced that there is no authority that the agency has by current statute. That is indeed likely what we will propose, and then the agency will go through the notice and comment process, take public comment. Care, at this point, is what I'm getting at. The agency at any time can put out a notice and propose rulemaking and change the 1995 position or change the 2018 position. Well, we should care for a couple of reasons, Your Honor. First, it shows that this case is not ripe. It's not ripe. And what do you do with the statutory provision about immediate review? Your Honor, I think ripeness is not a question in this particular context of Article III jurisdiction. It's a prudential question. There have been a lot of statements in the briefs about so-called backsliding, about what will happen to emissions under... I understand the point of your brief, but you don't challenge that at least two instances, and I thought there were five, where the where memo has already been relied on. No, Your Honor. It's the agency's position that this is the correct interpretation of the statute. Going to Judge Rogers, if there are two situations where your position has been relied on, has there been litigation? Have there been challenges? No, Your Honor, we're not aware of those. But there's no reason why there cannot be challenges. Absolutely not. From the surrounding community or the state? What state are they in? I believe one of them is in Indiana, and I'm not, as I stand here, aware of the other one. Well, whatever it is, certainly people in the surrounding area and environmental groups can challenge. Absolutely, Your Honor. Could you be clear so I understand? If I am a major source and I have a five-year permit, and let's suppose the permit ended at the beginning of this year, under the where memo, I can take advantage of this new approach, can I not? But if my permit didn't expire until next year, where would I be? Your Honor, I'm not aware of the individual permitting regimes of the states and whether and to what extent in particular states sources can take advantage. You can seek a modification, basically. Yes, Your Honor, and we've explained in pages 28 through 30 of our brief what will happen once the issue is teed up for state permitting authorities. And we've shown that this issue could come for judicial review under the Title V process, ultimately resulting in review under Section 307. We've also shown that it could come in for judicial review in the citizen suit process, as Your Honor just mentioned, by local environmental groups, who challenge individual emissions as contrary to law. And so we think that is the appropriate and proper context in which this issue should arise, because this mere guidance document is not a legislative rule and it's not final agency action. I think Your Honor put it very well. It's the policy position of the agency, and it must be defended in subsequent adjudicatory proceedings. And we will defend it in those Title V adjudications. We will defend it to the extent we're implicated in the citizen suits. But it does not actually have the force and effect of law. It is one of those provisions, I didn't recall, where you have to come to the D.C. Circuit? I think there are national implications. Your Honor, I am not in all circumstances. Your Honor alluded to your opinion last year in NIDACAP that the administrator has the ability under 307B1 to certify a nationwide scope and effect. And it seems like this may be... As far as hell does sing, Your Honor, this is... I mean, I would be quite astonished if you didn't take the position this was nationwide. That seems like a very sensible and reasonable position, Your Honor. I did write about that. You did indeed. So, it is rather issued by the agency to advise the public of the agency's construction of the statutes that it administers. And, of course, that's the Supreme Court's formulation. Well, we're public here that's interested. It's a regulated public, right, in the state. Yes, indeed, Your Honor. Not a few citizens, except you. And that is why the guidance directed that it be sent to state permitting authorities. We, again, hope and expect that they will be persuaded that our analysis of the statute is correct. It's more than that, though, counsel. You said if they're not persuaded, we're going to overrule them. No, in fact, we did not say that, Your Honor. Again, explain pages 28 through 30 of the brief. We explain how the issue can arise under Title V. And contrary to what my colleagues on the other side said, there is no representation that we would issue certain permits or would deny certain permits. We will, at that time, have to make a decision that is independently justifiable, independently supported by the record, independently supported by what we think is persuasive reasoning in this 2018 guidance. Here's what I just want to be clear about. From the agency's point of view, as well as from industry's point of view, why wouldn't you want to get this issue resolved now? In this sense, that I'm a major source out there, and I see the Ware memo, and so I'm making my long-range plan. And now I know that I don't have to worry about some adjustments and some improvements that I would have been required to undertake under the FICE approach. All right? So I go out and I spend millions of dollars, and then five years later, a decision comes down. I just don't understand why something as critical as this, where Congress has had this major statute on the book, the agency wouldn't want to get this resolved. I'll let my colleague, Ms. Broome, speak for industry, Your Honor. But as for the agency, we are engaged now in rulemaking. This isn't rulemaking that we've thought about. This isn't rulemaking that we might do. This is rulemaking that's in the pipeline. So rulemaking on a speeding track is, what, three years? Your Honor, at that point... I'm industry out here, trying to figure out what to do. As to that point, as I said to Judge Silverman, we expect that a notice of proposed rulemaking will be published in the Federal Register in June, two months. We think it's a reasonable expectation that a final rule, which obviously will, the content of which will depend on the notice and comment process, that that will be published in June of next year. Now, wait a minute. I'm a little confused. What is the status of the W memo while you're going through the rulemaking? Your Honor, we think it is, again, for all the reasons we've discussed here, it's not final agency action. No, but it's the status. Now, suppose I'm a source, a major source, and I would like to move to area source in State of Ames tomorrow. Can I do that and rely on the policy position of the EPA to, in adjudication, to support me? No, you cannot rely on the policy position, Your Honor. What you will have to do is make your application to the appropriate state permitting authority... No, no, no. My point is, and then the state is going to turn me down, and can I then appeal to the EPA? If your EPA hasn't yet put out a regulation. Yes, you certainly can, Your Honor, under the... So, in other words, EPA could implement your position in the W memo without going through the notice and comment rulemaking. Your Honor... Did you hear my question? Can you implement the position in the W memo, in adjudication, without finishing the rulemaking? Yes, in the sense, Your Honor, that in that adjudication, we will not be able to cite the memo as authoritative. We will have to independently make our record, make our arguments, and if... You could take that policy position that's also in the W. Yes, we could take that... So you don't have to wait for the regulation. No, we don't have to wait... So why are you going through the regulation? Your Honor, because the regulation gives the agency a chance to address this comprehensively. As Your Honor said earlier this morning, agencies have multiple tools... But you could, in the meantime, have reached these decisions through an adjudication. Yes, indeed, Your Honor, and... Which would make the rulemaking sort of move. Well, certainly, that could be appealed to the Board of Appeals, you know, probably to this Court. It could, Your Honor, and again, our position is not that these kinds of issues are immune from judicial review. They're certainly reviewable at the appropriate time and place. No, you understand my point. I'm trying to figure out why you're even going through the rulemaking. Your Honor, because the rulemaking gives us an opportunity to address the issue in a comprehensive fashion. You wouldn't be addressing in a comprehensive fashion in an adjudication? Well, Your Honor, as has been discussed, we're at Chevron Step 1 in cases like this one and in these hypothesized adjudications. For what it's worth, I'm inclined to think you're not at Step 1, you're at Step 2. Well... But anyway, that's just one judge's view. And certainly, with the benefit of a rulemaking, we would have that additional authority from Chevron Step 2, and we would have the opportunity... Well, you could do that in adjudication, too. You could, Your Honor. Chevron Step 2 is reached in adjudications, too. I certainly would not concede that we couldn't, but we have... it's the more traditional road to... No, no, there's all kinds of adjudications that go to Chevron Step 2. Admittedly, Your Honor, I guess it's a... We're more confident, more certain to get that kind of deference after comprehensive rulemaking where we take notice and comment, and we develop the factual record that will be important in determining.  Your Honor, I'm happy to answer any other questions. Well, what about the question of finality, which is the key question? Why do you believe the... what do you believe... how do you treat the argument that the Ware Memo is final because it de facto overrules a prior regulation, the CITES Memo, which, of course, was not published as a regulation, not described by the agency as a regulation, but now it is described as a regulation. Therefore, presto, it becomes a regulation, and therefore the statement of the Ware Memo, which could be called a policy statement, is actually, therefore, a reversal of a prior regulation, which has to be done through notice and comment. What do you do... what do you deal with that argument? Based on... the argument is all based on this transformation of the CITES Memo, miraculous transformation from a guidance document into a regulation. First of all, Your Honor, we disagree with that transformation. Well, I'm surprised. We... as Your Honor has previously alluded to, the very title of the document, and this is at JA 232, it's a memorandum, and the memorandum is regarding guidance on timing issues, and it was not published in the Federal Register. It was subject to multiple revisions. The Court has alluded to whether the guideline... whether those 1995 guidelines were applied inconsistently, and I note that on page 25 of California's brief, there are three citations to it being applied one way. We've heard references to Joint Appendix 258 and 259 to it being applied the other way. So, EPA submits that there's certainly no clear record on a perfectly consistent guidance or application of the 1995 guidance over the years. So, we submit that it is not a legislative rule. It is, as I quoted before from Perez, guidance... it advises the regulated public on the agency's construction of Section 112, and now the agency has taken what we think is a better view. And so, getting back to finality, Your Honor, it's our position that it does not mark the consummation of the decision-making process with respect to any particular emissions requirements. Those are set forth in the Title V operating permits. Those with initial decision-making by the state permitting agencies and review by the agency. And two, it's not an action that determines the rights and obligations of the regulated parties. And in that regard, this Court's cases have used many different formulations, but a recent one, Sierra Club v. EPA in 2017, and that was quoting then-Judge Kavanaugh's opinion in National Mining Association, is actual legal effect. And as we've discussed here this morning, we submit that this memo all by itself does not have actual legal effect. It is not binding, and we're, as a consequence of that, not going to be pointing to the memo as a justification for whatever adjudicatory actions the agency takes. So how does the where memo characterize the site's memo? It characterized it, and this is in the second full paragraph, a prior EPA guidance memorandum has taken a different position. That's on JA1. Right. And so I think the agency's position... It says the guidance here supersedes that. I'm sorry, I didn't understand it. Well, on the same page you're on, go to the next paragraph. Yes, the guidance here supersedes that which was contained in the earlier guidance.  Yes, Your Honor. Your Honor, the agency's position is that the 1995 guidance was legally incorrect interpretation of Section 112. And the agency, I think in an exercise of good government, is announcing to the regulated public and state regulators its new position, just as the Supreme Court anticipated in Peretz. Well, Peretz talked about something different. And what's the other point? The statements of legal position are not binding either? They're not, Your Honor. Your Honor, we are... No party, no state agency is bound in the sense that the mere invocation of a memo is sufficient to decide, to make a permitting decision and sufficient to defend... The memo says that EPA has no authority to impose the type of temporal limitation, because it's not in definition. That's not binding on EPA either. In other words, Judge Sullivan asked, why do this rulemaking? I asked, why do the memo? Why do the memo, Your Honor? Because EPA can just ignore it. Well, again, we hope that those who read it will not just ignore it. No, but the brief says EPA can ignore it. Everybody can ignore it. Well, that can't be true. EPA can ignore it. I think ignoring in this context is perhaps an exaggeration, Your Honor. As for parties outside the agency, we hope and expect that they'll be persuaded, and we intend to inform them of our position. As for our own employees, yes, we expect that our own employees will adopt this litigating position. But the point is, the agency will have to defend that position without reference to the fact that it's embodied in a memo. If it were embodied in a duly noticed and commented upon... I don't even understand that argument. Why can't it refer to the memo? It's not a question of referring, Your Honor. It's a question of authority, whether the memo is authoritative. You're relying on the principle of administrative law that a guidance document that is not a regulation cannot be relied on as giving independent legal status. Yes, indeed, Your Honor. That's right. I think that is correct. We acknowledge that position. No, that's not my question. I'm saying the agency itself has taken this position in a memo. And the way I read your brief is nobody's bound by it. Yeah, that doesn't seem to make sense. I'm sure the EPA is bound by it. I don't think that's decisive because the regulated world is not bound by it, neither the states. But certainly EPA is bound by it. Well, Your Honor, certainly one important point is that regulated parties and state permitting agencies are not bound. We expect that our employees will act consistently with this memo. I should hope. But we will have to defend the position in the subject. Again, in contrast to... What you mean is your EPA and an adjudication of your EPA people would not say, look to the where memo as the authority. Correct. That's fine. Correct. They would have to have their own independent interpretation of the statute. Yes, indeed, Your Honor. So there would never be a consummation of the agency's position until it's approved? No, Your Honor. There would be a consummation in individual adjudications, in individual permitting decisions in that Title V process that we've described in pages 28 through 30 of our brief. And which, if you follow my comparing opinion, you would take that case to the D.C. Circuit because it's certainly of national implication. It does seem so, indeed, Your Honor. Anything further? Nothing further, Your Honor. I'd urge the Court to dismiss the petitions. Thank you. On ground. All right. Counsel for intervenors. Good morning, Your Honors. And may it please the Court. My name is Shannon Broome, and I'm here today on behalf of the intervenors on the side of EPA. In the case, I did want to get to your question, Judge Silberman, right away about the inconsistency of application of the CITES memo. And, first of all, EPA never actually treated the CITES memo as a rule. It didn't do it in 1995 when it first issued it. It didn't do it in 96 when it extended it and modified it slightly in 98. It did that again in 99, again extended and modified, and in 2001, 2006, and then in 2011 in those specific guidance memos. And I will say that- These were all modifications? No, the last ones were applicability determinations in which they did not apply the principles in the CITES memo. In other words, they created exceptions to the CITES memo. Right. How many different exceptions were created? There are three, and EPA has a computer database, which is somewhat inconsistent as to uploading individual applicability questions that they might get. So there could be many, many more out there. I'm personally aware of a couple that are not memorialized, but in having practiced in this area for 30 years, it has- These are evidence of the lack of consistent application. Are they in the record? They're in the JA. Yes. So, for 30 years, what have your clients been doing? Well, if there was a situation like if somebody was eliminating a hazardous air pollutant from a particular type of process, they would go to the agency and they would say- They'd go to their state's permitting authority and say, we don't believe this standard is applicable. And remember, these standards were issued over the course of years, so it's not like they existed. Well, you know that, Judge Rogers, because you've adjudicated many of the 112 standard cases. But so they say, okay, I'm going to become minor. The first substantive compliance date has already passed, but I think that the CITES memo is inappropriate to apply here. They go to their state permitting authority. It either agrees or disagrees. If it agrees, the standard does not go in the permit. I think that EPA has an opportunity to object to that. Members of the public have a chance to comment on that. Counsel, just answer one simple question. Are there circumstances where EPA has permitted sources to operate inconsistently with the CITES memo? Yes. How many of those? Three that we can account for and others that I'm aware of. They're in the record. What is the grounds upon which EPA allowed exceptions to the CITES memo? In some instances, they would say, well, you stopped using the particular pollutant, and it's not on your site anymore, and we think that's permanent, so we'll choose not to apply it. Does that mean that source was dropped to an area source? Yes. Notwithstanding, that's inconsistent with the CITES memo. Correct. And then in 2006, of course, Assistant Administrator Wareham, who is now again the Assistant Administrator. Excuse me, one other question. Do all these situations come up through Title V? Yes. Because a major source is required to obtain a Title V permit. So to your question about Indiana, or Mr. Grant was speaking to Indiana earlier, that source in Indiana, it needs to apply for what's called a significant modification of its Title V permit under Section 70.7 of the federal rules and the corresponding state rules, and I have permitted and litigated permits in Indiana, so the rules are the same in Indiana as at the federal level. Comments are made, and then it would go out to EPA for a potential objection, and then if EPA objected to the permit, then it would have to be revised. If EPA did not object and the standard source was reclassified, then a member of the public could challenge that. So now, you're saying that the individual sources had a path to release, all right, besides these three. Right, and if EPA decided against them, they could decide to appeal their permit. No, no, I understand, but I'm just trying to understand, what was the site's memo? It was the guidance document. Yes, I know. So EPA didn't have to follow it? Obviously not. EPA chose not to, I can't speak for, I don't work there. No, I know, that's why, I'm just trying to understand, EPA's brief says, this new memo didn't buy me either, all right, and, you know, I thought, well, that means the agency sees a horrendous situation, and they decide, no, you can't convert to an area source. Of course, that's not what the memo said. On the other hand, your client who seeks a major modification, or whatever the technical term is that you referred to, won't have to go through that anymore. It'll be automatic. Well, if the state determined that the memo didn't apply, or that they chose not to follow the memo, then that would be litigated in state, the way Title V works, you appeal to the state administrative law judge, and then it goes to federal court after that. No, I understand that if Indiana wants to do something differently, fine, all right, but now EPA is telling us, don't worry about us, all right, we're not going to be the problem anymore. So if the state wants to have a regulatory regime that is either stricter or less strict than where EPA is, that's fine. So what California says to us, look, we've been proceeding for decades under the CITES memo, and our whole state plan piggybacks on the federal CITES memo enforcement, or however we want to frame it. And while the CITES memo has been applied as a guidance document, looking individually at a source, and making the judgment call in its expertise, the wheel turns now, and A, what, the burden just shifts to the state, or it shifts to the D.C. circuits in terms of litigation brought by the fishers and others. Just trying to understand what's changed. I mean, I assume your clients are happiness indeed, all right, and so it's the states that are upset, and environmentalists here. But neither memo, from what you're telling me and what EPA is telling me, really has no legal effect on anybody. Not at this time. They're doing a rulemaking, and to answer your question earlier, Judge Silverman, from our perspective, we think that having it in a rulemaking so that it is clearly a legislative rule that would require notice and comment to change, regardless of which way it comes out, I think is good government. And people need to know what the rules of the road are, and it's the last 20 years of inconsistent implementation of the CITES memo. Sometimes they do, and sometimes they don't. And I imagine that will be back before some semblance of a panel here at some point, and we'll see our friends again in this place. But, you know, it's not as if – I do want to just make one more point, if I could. The WERA memo has been cast as being somehow unprotective, and the fact is that the WERA memo creates a limit, a mass limit per year, and under the match standards that exist under Section 112, those are not emission caps. They are rate-based limits, and if your production goes up, your emissions go up. So the characterization that everything is one-sided or another is – or not. And I guess to the point earlier on the definition, Section 112A1 provides the petitioners the ability to go to EPA and seek a lower quantity, a lesser quantity threshold for major source for any given pollutant that they're concerned about. And people have petitioned EPA for lower major source thresholds for different pollutants over time. What they want to do is an end run around those statutory provisions and not go through that. Pardon me? Who's that? They're the petitioners, because effectively they're asking you to freeze the situation with respect to the major source threshold. So if I reduce my emissions below and I'm willing to take a limit below the major source threshold, I have to live with that. And they said, oh, but you could increase emissions of dioxin or mercury or any pollutant on the list. And the fact is that there's a procedure. If you think that the 10 and 25 is too high, Congress set 10 and 25, and the UARG case tells us that when Congress says 10 and 25 or 250 and 100, that's what it means. And you don't write into it an additional qualification. And EPA, if you look at the 100 and 250 thresholds that were at issue in the UARG case, EPA doesn't take the position that you are forever, once you go into the new source review world, that you are forever a major source. You can go back, and this court... You mean even under the CITES memo? You can drop from a major source down to an area? No, the CITES memo is the only instance in which they took that position. But all these are Section 165 of the Clean Air Act. Wait a minute. What the devil did you just say? The CITES memo isn't in operation? No, the CITES memo did take that position. If you applied it, it would not allow. If you applied it? You mean it wasn't applied? It was not applied consistently. Anything further? Thank you, Your Honor. Thank you. All right. Counsel for environmental? A couple of minutes here. I'd like to make two points as to finality and two points as to the problem. The first is that I think it's important to recognize that these standards, these maximum achievable standards, are federal standards that are directly applicable. These are not like Section 110 where there's the state that implements them. So there are two separate things. There's a state's ability to give a source a potential for remitment. It could do that for the wearer memo. It could do that after the wearer memo. Nothing has changed. But the wearer memo changes are the consequences of that change for the federal program. That is something over which only EPA has a say. Right? States, I mean, once that potential for remitment is in place, and again, the wearer memo treats nothing about that, states have no ability to say, well, you're not subject to that standard. Or states can contest EPA's position. No, EPA makes the decision. No, no, but states can contest it and take it to litigation, right? No, he's talking about the federal program. I mean, so there are two avenues, two other fora that are available. One would be an enforcement action, right? I mean, the state or we could say, well, no, EPA's wrong. You're in violation of the act. But Whitman and National Rehabilitation Defense Council, I mean, those cases are very clear that under 307, the root is not pre-enforcement review is the rule. It doesn't go to it. And one way to imagine this, right, is if this scenario were flipped, the EPA said, well, actually, all of these sources, you are subject, right? I mean, the point of 307 is that sources don't – they don't have to wait to violate the act, nor do we have to wait to try to enforce on the ground. So that question, I think, I mean, yes, it's possible, but Whitman answers it and this court in General Electric and Natural Resources Defense Council has answered it as well. The other potential forum is – Well, wait a minute. I understand your argument about the case law, which I think is really quite confusing. But there is no question, is there not, that if a source wished to move from major to area and a state thought that was appropriate, a state thought it was inappropriate, let's say, a state thought it was inappropriate, rejected it, and then the source appealed to EPA. EPA could overrule, right? And then the California or any state could take it to this court. Well, not in every case. I mean, there are cases in which a – Well, that's just – Well, just to give you an example, I understand this is confusing. I'll try to think about two things. I mean, the first is that there are cases in which sources are only subject to Title V because of this particular requirement. So if they fall out of the program, right, there is no further – there's no Title V process, there's nothing, right? That's at the end of the line. Because of this requirement. Because of this requirement. But the other – What is this requirement? No, I don't know. Well, because of the wearer. All right. Let's be clear. You're talking about because of the memo, the 2018 memo? Yeah, the wearer memo. The W memo, if you will. No, no, no. You said sources. You were trying to distinguish for us. So really the central point is that there's two separate things here. One is a source's ability to move from major – to take a potential to omit limit. And states have been doing that sort of thing for a long time. States have been doing what? They have been giving sources – they've been limiting sources' potential to omit. Yes. And the wearer memo changes nothing about – The only question, as we read the brief, is whether or not you can go from a major source to an area source. That's the issue, isn't it? It's the consequences of the change in potential to omit. I'm sorry. Is that – that's the only question, whether you can go from major to area. I don't – with respect, I don't think that's the only question. The question is, when that happens, when the potential to omit limit arrives, is the source still subject to the maximum achievable standard or not? Well, that's the same thing, isn't it? With respect, I think it's a separate question. I simply do not understand. You could have a source before the wearer memo that was subject to a state rule that brought potential to omit below the major source threshold. Before the wearer memo, that source would still have to comply with the standard. Right? So it's not the change of potential to omit. It's what that does to the federal requirements. So in other words, you could go down to an area, but you'd still be subject to the same standard as a major? Well, you could go down below 25 times, and you would be subject to the same standard. That was the site memo. That was the rule. So you could come down to – Let me be clear here, because this is confusing. I think the answer to Judge Stiller's question is yes, isn't it? Well, the reason – I mean, yes, you could come down – What's confusing about this is calling it an area source, which is why I'm kind of focused on the actual threshold itself. So, yes, the source could bring a submission to the point where it would qualify as an area source. But with a wearer memo, that doesn't matter, right? You're still subject to the standard. And that's what's changed. It's the federal standard that applies. You take the source and – By federal standard. The national – the maximum achievable standard. The max standard. Right. 40 CFR subsection of A through – Let me just be clear what the terms refer to. Right. So, when the state allows a source to operate under what we'll call potential to emit, that is tantamount to area level federal, that doesn't mean or doesn't – that the source can avoid the max standards. Well, that's the key question. I mean, sources could always limit their potential to emit through state permits. Right. The question is, when they did that, are they still subject to the mandatory standards? So, 40 CFR, 63 subpart. Why is that any different than the simple question we understood from the briefs? Whether or not you would go from a major source to an area source? Under the federal standard. Well, the question is, does the federal standard still apply? Right. What are the consequences of that change? Well, if you went from a major source to an area source and the standards were still that as a major source, then it didn't make any sense. Then it has had no implication. I understood the briefs that the fight was whether you could go from a major source to an area source and therefore have lower regulatory burdens. That's right. But if you go from a major source standard to an area source standard. Right. I'm just trying to distinguish between a potential to emit question, but I want to state that somewhat thoroughly. Well, I understood always the potential to emit was the key factor. But still, you could go from under the W memo. You can go based on potential to emit. You can go from major to area if your potential to emit is much lower. You can go from one federal standard to the other federal standard. Right. That's what the fight is about, isn't it? That's right. So the two points I want to make is first, that's something where states have no role. But they do have a role in objecting. They can litigate. In a citizen suit. Either as states or in a citizen suit. Well, right. Sorry. Under Section 304. Yes. Right. No, that often exists. Our positions at Whitman suggest that that's not true. And I think Whitman, because Whitman says Section 307 provides for pre-enforcement review. No, well, you're not saying it's not true. You're arguing Whitman gives you pre-enforcement review. Right. You're not saying that the system didn't work. The enforcement review doesn't work. It is possible we could do that. Yes, of course. Okay. Now, I understand your legal argument is you're not limited to that. You're entitled to pre-enforcement review. Right. But the reason I wanted to distinguish between the potential to omit question and the consequences of the change of potential to omit is that what's important is that EPA has conclusively answered that question. And in that sense, this case is indistinguishable from National Environmental Development Association versus EPA or from Appalachian Power versus EPA. Okay. What's the first site? It's a case site for the... Yeah. I mean, I've got Appalachian Power, but... May I consult my notes for a moment? 752F3-999. Thank you. I mean, those are both cases in which EPA decided a discrete legal question. And yes, there were further steps in which that standard, the standard EPA articulated, would be applied to particular sources. But that didn't matter. What mattered was that the decision EPA made was, first, on its face, the confirmation of the agency's decision-making process. And this document is very clear. It does not say, visual administrators, go think about this. It says, we, EPA, have decided. And then the second standard is whether it has been treated in the field as being the confirmation, as being effectively final. And if you look at that, these are state decisions attached to our standing affidavits, Addendum 168 and Addendum 282. It is very clear the states are treating this as binding and final. And none of these states are saying, oh, well, actually, maybe the federal subpart MMM still applies. You know, EPA told us it doesn't. That is the end of this. So, EPA's position is very close to, well, it's only legislative if we, it's only final once we go through the notice and comment process. But, no, they would concede that it would be final once it goes through adjudication. That if California or another state objected or an environmental group was standing, objected, and it went, it would end up in the D.C. Circuit. I'm almost sure it would end up in the D.C. Circuit. And at that point, there would be a conclusion as to whether the statutory interpretation of the government offers is correct or not, or acceptable or not. Fair enough. But I think, again, here, it's just Appalachian Power and then National Environmental Development. Appalachian Power, I agree with you. Your cases in this circuit are a nightmare. They're all over the lot. And Appalachian Power, in my judgment, goes way too far. It suggests that it actually says, if an agency even indicates what its enforcement position will be, it is revealable. I think that is clearly wrong, clearly wrong, and inconsistent with other cases. And the Supreme Court would never buy it. But this isn't, I mean, D.C. is not saying we're going to enforce it. That's like saying these standards no longer apply. I mean, it says that. Yes, but that's the enforcement position it's going to be. That's their adjudicatory position. They had to take away, if they were going to take a different adjudicatory position than cites, they had to take away cites. But that consequence doesn't wait for some adjudication. I mean, if not, the sources are currently out from under the surface. They will not be subject thereafter. I understand. But we keep we're going back. I if I'm in the state of California, I would say the first moment that they permit a source to modify to go from major to area. I will take that to EPA. EPA will turn me down because they're present and I'll take it to the D.C. Circuit. I agree with one thing. I think the line here is between you saying, well, we could change your mind later. Right. And the ability to change its mind did not affect finality or the thing we had not made up. The key to finality is whether the that's one possible. The real key is whether it's binding on the parties. And I do not see this as binding on anybody. Well, again, Reid is binding on it. Oh, except the EPA employees. But that's that's the only people who matter. That's not enough to be binding. You have to look at the fact that these subparts are applicable or not. The states don't have no ability to say that. No, but they have they have ability to contest. Right. There are other fora in which review could be available, but that's it should not affect review here. But now we're back to the right. May I just briefly address the problem? In half a second. A minute. I'll just give you in terms of I mean, what happened with the issue in the record is what we already know is overflowing with promise rulemaking that never happened. And that is how something that starts with the guidance ends up being treated as a rule. That's exactly what we are right now. We have a decision that is having current effect that is being treated as a rule. And the agency is saying, well, wait for later, please. The site never happened, which got us into the whole mess. That is why we are concerned with review happening. All right. Council of California. Thank you. I will try to keep this very brief. With respect to innovators argument that the site policy was applied inconsistently. I would like to point the court to J59 and J60, where industry intervenors in commenting on the 2007 proposed rulemaking specifically stated that the site's memo was, in fact, a transition policy that became law without notice to the public. This is not the first time that industry intervenors have commented on the site's memo being binding and consistently applied and tying the hands of industry to the position that was set forth in the site's memo. So it is difficult to hear the argument now being set forth from the court. Doesn't this court have to be distressed at an agency using a guidance memo to de facto make a rule without going through notice and comment? Yes. I absolutely believe this court should find it troubling that an agency is using a guidance document to have the force and effect of law, to revise a governing legal norm. These are all the points that we made for findings of where a memo is legislative and the site's memo was legislative. So if you eliminate both memos, if we say, OK, eliminate both memos, then what? It would be difficult to eliminate the site's memo. I don't want to reiterate my colleague's comments on the statute of repose because the site's memo isn't before the court today. But it is. It is before the court because one of the arguments made is the site's memo has de facto become a regulation. I understand. And therefore, it requires a regulation to repeal it. Well, I do still believe the site's memo would be subject to the U.S. Civil Claims Statute of Limitations of six years. And we're long past that. So I do think I understand why it would be procedurally subject to challenge. That challenge is not there. So I do believe that the site's memo would be subject. It's more than a procedure. This is not the classic procedural challenge for rulemaking. This is taking an orange and calling it an apple. I understand that there's an element to trying to characterize the site's memo as legislative as well. That said, if in this hypothetical that Your Honor has raised, there's nowhere a memo and there's no site's memo, then we are left with the plain meaning of the statute, which is, we argue, consistent with the site's memo. If there's no memo either way, there's nothing before us. There's nothing before you, but there is. Until there will be something before you. But there is, Your Honor, something before you. There's the Wareham memo, and which I shall go back to say is to just make one final point on finality. And Mr. Nyan pointed the court to the NEDACAP case. And in that case, I think what is instructive here. I'm sorry, again, it is 752 F3rd 999. 999? Yes, Your Honor. All right, that's the same one. Sorry, yes, I am reiterating it. But then again, to point the court to that case, finality is reflected in whether the agency has a settled agency position with legal consequences. And I understand EPA is saying that it will not be following the legal position that's filed in the Wareham memo in a subsequent challenge. But it is binding. They don't rely on the Wareham memo. They rely on a position taken by the Wareham memo. That's a distinction. That's the classic policy position of an agency. We are going to take this position in adjudication. It's important agencies be allowed to state that without being subject to immediate judicial review. Because people should be aware of what the agency's litigation position would be. Understood, but EPA is also going to be relying on that. EPA itself, but nobody else is. So EPA says, okay, we're going to take this position in litigation. That's the classic policy statement. And so you know what they're going to take. You're prepared. You want to fight. You take it up through litigation. You get it to the Court of Appeals. You either win or lose. Understood, but there's also the second part of the inquiry, which is whether there are legal consequences flowing from that. Other than EPA's position is going to be everybody who disagrees doesn't have to. Their position has not added anything to the legal position. So what do you see as the legal consequences? The legal consequences that while are removing the mandatory obligations that were previously applied to major sources. The legal consequences are that states such as California no longer can rely on the federal regime. We need to now evaluate whether we need to adopt backstop measures in order to protect our public health and our residents. The legal consequences are the surrounding communities around these sources that are no longer classified. I'll see if it turns out that they're correct. If you litigate it and it turns out they're wrong. Understand, but this court can settle that today. Oh, sure. Well, all we could settle was somebody giving a speech, too. I understand. But that is, again, and I guess we are now talking in circles, I guess, because we are now back to the cement kiln. Your first point about legal consequences, EPA responds by saying it's all speculation. EPA's argument is that it's speculative whether these individual permitting decisions will really apply and actually rely on the WAM decision. Well, I thought it was taking even a stronger point, and that was that if a source is no longer required to adhere to stricter requirements, there may not be any negative consequence to the environment or the individual. And this is not EPA, but taking it a step further, I mean, over the last 30, 40 years, there have been a lot of advances, technology, et cetera. Industry in its own self-interest has necessarily made adjustments, modernized, et cetera. So what might have been a disaster 40 years ago is no longer going to be a disaster, so all these regulations aren't necessary. I understood that the record that is before this court is those comments that were submitted during the 2007 rulemaking where EPA regional offices themselves were concerned about this net increase, and state pollution control agencies and the public were concerned about this net increase. And actually, industry specifically in one of their comments stated, okay, we're okay with the reversal, but don't set the standard at the max level that we're currently operating at. So is your point for purposes of finality here that where there is an administrative record supporting one point of view, if the agency wants to take a different policy position, that's fine, but it has to have some data to back it up. So EPA says, well, we're going to do that in support of the proposed rulemaking that we sent over to OMB. Why isn't that a good response? That is a great response, and we did raise that, that EPA has failed to analyze the impacts of the WERA memo itself. It's failed to address those very concerns that were raised during the proposed rulemaking in 2007 that there would be this net increase. But I guess it's saying that, I don't want to drag it out, but, you know, it can change its policy, all right? And if you don't like it, you can challenge it. There will be opportunities for you to challenge it. And to the extent you're saying EPA doesn't have any data that can overcome the data that already exists, EPA says, well, we're going to get that during the rulemaking. We're going to get that during the rulemaking, but there's impacts of the WERA memo today and on the ground that are being felt by the public. Hence the sense of binding and confirmation of the decision-making and legal consequences that flow. Even though I'm just trying to nail this down pretty quickly, I understand generally if a heavily polluting source no longer has the control of emissions to as great an extent as it used to, then the people in that community will be harmed. And I understand EPA to say, theoretically, that may be true, but you need some data. Yes. And you haven't presented it. And there has been no presentation of that data, Your Honor. By you either. By us either, but at least the data that is in the record before the court is that there is evidence of backsliding. There is a potential for backsliding. We have not seen strong evidence to counter that, but there is, I believe, significant evidence in the record to show the contrary. Thank you very much. Thank you. That's the case under advisement.
judges: Rogers, Wilkins, Silberman